**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| **NICHOLE HARRIS, on behalf of The Suter Company, Inc. Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MIGUEL PAREDES,**<br>**PRUDENT FIDUCIARY SERVICES, LLC,**<br>**a California Limited Liability Company,**<br>**TIMOTHY P. SUTER,**<br>**GEORGE B. SUTER, and**<br>**DANIEL B. SUTER,**<br><br>**Defendants.** | **Case No.** |

## COMPLAINT

Plaintiff Nichole Harris, by her undersigned attorneys, on behalf of The Suter Company, Inc. Employee Stock Ownership Plan, and similarly situated participants in the Plan and their beneficiaries, alleges upon personal knowledge, the investigation of her counsel, and upon information and belief as to all other matters, as to which allegations she believes substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

## BACKGROUND

1.      Plaintiff Nichole Harris ("Plaintiff") brings this suit against Miguel Paredes and his operating company Prudent Fiduciary Services, LLC ("PFS", and together with Paredes, "the Trustee"), the fiduciary trustee for The Suter Company, Inc. Employee Stock Ownership Plan (the "Plan" or the "ESOP") when the Plan acquired shares of The Suter Company, Inc. ("Suter

1

Company" or "the Company") in 2020; and Timothy P. Suter, George B. Suter, and Daniel B. Suter, parties in interest to the Plan from whom the Plan acquired Suter Company stock (together, "Selling Shareholders").

2.      Plaintiff is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan who was vested under the terms of the Plan in shares of Suter Company allocated to her account in the Plan.

3.      This action is brought under Sections 404, 405, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1106, 1109, and 1132(a), for losses suffered by the Plan and its participants caused by the Trustee when it caused the Plan to buy shares of Suter Company for more than fair market value and thereby misused the Plan's money to the benefit of Selling Shareholders, and other plan-wide relief.

4.      As alleged below, the Plan has been injured and its participants have been deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA.

5.      At all relevant times, Suter Company was a privately held company and party in interest to the Plan. Suter Company adopted the Plan effective retroactively as of January 1, 2019. On September 2, 2020, the Plan, through its trust, The Suter Company, Inc. Employee Stock Ownership Trust ("ESOT"), purchased from party in interest Selling Shareholders, directly or indirectly, 100,000 shares of Suter Company common stock for $62,371,709, which was financed by a $62,371,709 term loan agreement with Suter Company, and on November 1, 2020, as a result of a working capital adjustment, the purchase price and note payable to the Company were adjusted to $63,840,499 (the purchase and loan transactions together, the "ESOP Transaction" or "Transaction").

6.     The Trustee represented the Plan and its participants as fiduciary trustee in the ESOP Transaction. It had sole and exclusive authority to negotiate the terms of the ESOP Transaction and to authorize the Transaction on the Plan's behalf. The stock and loan transactions that the Trustee caused the Plan to enter into with parties in interest were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a).

7.     The ESOP Transaction allowed Selling Shareholders to unload their interests in Suter Company above fair market value, for the reasons explained below, and saddle the Plan with tens of millions of dollars of debt over a 33-year repayment period to finance the Transaction. The Trustee failed to fulfill its ERISA duties, as trustee and fiduciary, to the Plan and its participants, including Plaintiff.

8.     Selling Shareholders sold shares in the ESOP Transaction and received the Plan's monetary assets in the Transaction. Selling Shareholders are liable under ERISA for knowingly participating in the prohibited stock transaction and the Trustee's breaches of fiduciary duty under ERISA, and as co-fiduciaries to the Trustee who participated in, enabled, and did not make reasonable efforts to remedy the Trustee's breaches of fiduciary duty.

9.     Through this action, Plaintiff seeks to enforce her rights under ERISA and the Plan, to recover the losses incurred by the Plan and the improper profits realized by Defendants resulting from their causing prohibited transactions and breaches of fiduciary duty, knowingly participating in the prohibited stock transaction and breaches of fiduciary duty, and failing to meet their duties as co-fiduciaries, and equitable relief, including reformation of Transaction contracts, rescission of the Transaction, and removing Defendants as fiduciaries and enjoining them from acting as fiduciaries for any employee benefit plan that covers or includes any Suter Company employees or members of the Class. Plaintiff requests that these prohibited

3

transactions be declared void, Defendants be required to restore any losses to the Plan arising from their ERISA violations, Defendants be ordered to disgorge to the Plan any improper profits, and any monies recovered for the Plan to be allocated to the accounts of the Class members.

## JURISDICTION AND VENUE

10.    This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff under ERISA § 502(a), 29 U.S.C. § 1132(a), to require Defendants to make good to the Plan losses resulting from their violations of the provisions of Title I of ERISA; to obtain appropriate equitable relief against Defendants; to restore to the Plan any profits that have been made by breaching fiduciaries, parties in interest, or others through the receipt or use of Plan assets in violation of ERISA; and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

11.    This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and it has original jurisdiction pursuant to 28 U.S.C. § 1331.

12.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, because some of the events or omissions giving rise to the claims occurred in this District, and because a defendant resides or may be found in this District. The Plan is administered in Sycamore, Illinois.

## PARTIES

13.    Plaintiff Nichole Harris is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since on or about the effective date of the Plan. Plaintiff resides in DeKalb, Illinois. She was an Assembler at Suter Company. She was employed at Suter Company

from on or about February 2016 to January 4, 2023. She was vested in shares of Suter Company in her Plan account.

14.     Defendant Miguel Paredes is the President and Founder of PFS. Defendant Paredes's business address is at Prudent Fiduciary Services, LLC, 100 N. Barranca St., Suite 400, West Covina, California 91791.

15.     Defendant Paredes was the trustee of the Plan at the time of the ESOP Transaction. The ESOT trust agreement he entered into with Suter Company was effective as of June 8, 2020. As trustee, Defendant Paredes had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan.

16.     Defendant Prudent Fiduciary Services, LLC ("PFS") is a California Limited Liability Company. PFS bills itself as a provider of professional Independent Fiduciary/ESOP Trustee, ERISA compliance consulting, and expert witness services related to employee benefit plans such as qualified retirement plans and health and welfare plans. PFS's headquarters is at 100 N. Barranca St., Suite 400, West Covina, California 91791.

17.     PFS was at all relevant times Defendant Paredes's operating company and is the name of his practice. PFS was the trustee of the Plan at the time of the ESOP Transaction. As trustee, PFS had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan. Defendant PFS acted in the ESOP Transaction through Defendant Paredes. PFS provides a team of approximately fifteen full-time individuals to execute ESOP transactions including an in-house business appraiser, office space, a routine due diligence process, and insurance.

18.     At the time of the ESOP Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee

5

within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. As Plan trustee, the Trustee was a named fiduciary, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

19. Defendant Timothy P. Suter is and was at the time of the ESOP Transaction the President, Chief Executive Officer (CEO), and a Director of Suter Company. He was a Selling Shareholder in the ESOP Transaction. He resides or may be found in this District, as he resides in DeKalb, Illinois, and works at Suter Company in Sycamore, Illinois.

20. Defendant Timothy P. Suter was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a Suter Company officer and director; a Plan fiduciary; a 10 percent or more shareholder of the Company, directly or indirectly; and as a "relative," within the meaning of 29 U.S.C. § 1002(15), of George B. Suter.

21. Defendant George B. Suter is and was at the time of the ESOP Transaction a Director of Suter Company. He was a Selling Shareholder in the ESOP Transaction. He is the former President of Suter Company, the son of its founder, and the father of Defendants Timothy P. Suter and Daniel B. Suter. He resides in Sycamore, Illinois, in this District.

22. Defendant George B. Suter was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a Suter Company director; a Plan fiduciary; a 10 percent or more shareholder of the Company, directly or indirectly; and as a "relative," within the meaning of 29 U.S.C. § 1002(15), of Timothy P. Suter.

23.     Defendant Daniel B. Suter is and was at the time of the ESOP Transaction a Director of Suter Company. He was a Selling Shareholder in the ESOP Transaction. He is the former Vice President, Sales and Marketing of Suter Company.

24.     Defendant Daniel B. Suter was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as a Suter Company director; a Plan fiduciary; a 10 percent or more shareholder of the Company, directly or indirectly; and as a "relative," within the meaning of 29 U.S.C. § 1002(15), of George B. Suter.

25.     Selling Shareholders, members of Suter Company's Board of Directors, have and had at all relevant times fiduciary power to appoint and remove other Plan fiduciaries, to wit, the Plan's trustee and ESOP Committee, and were fiduciaries as directors of the Plan Administrator and Named Fiduciary, Suter Company. At the time of the ESOP Transaction, Selling Shareholders were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## FACTUAL ALLEGATIONS

26.     Founded in 1925 by Charles B. Suter, Suter Company is a food manufacturer based in Sycamore, Illinois. Suter Company was incorporated in Illinois on January 3, 1956. Prior to the ESOP Transaction, Suter Company was owned by members of the Suter Family. Defendant Timothy P. Suter, grandson of the founder, became involved in ownership and management of the Company in 1990 and became President and CEO in 1998. Suter Company

had more than 300 employees at the time of the ESOP Transaction. Suter Company is an S corporation.

27.     Suter Company is headquartered at 1015 Bethany Road, Sycamore, Illinois 60178. That address is the Plan Administrator's address.

28.     Suter Company common stock is not and never was readily tradeable on an established securities market.

29.     Suter Company adopted the Plan with a retroactive effective date of January 1, 2019.

30.     The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

31.     The Plan is intended to be an employee stock ownership plan (ESOP) within the meaning of Code Section 4975(e)(7) and Section 407(d)(6) of ERISA, 29 U.S.C. § 1107(d)(6). The Plan was designed to invest primarily in the employer securities of Suter Company.

32.     The Plan's principal asset was Suter Company common stock at all times since the ESOP Transaction.

33.     The Plan is an individual account plan, or defined contribution plan, under which a separate individual account is established for each participant.

34.     Suter Company is and was from the inception of the Plan the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

35.     The Plan's Forms 5500 and attachments thereto identify Suter Company as the sponsor and administrator of the Plan, and as a party in interest.

36.     The Plan's Summary Plan Description (dated December 2019) ("SPD") discloses that Suter Company is the administrator of the Plan. Suter Company's Board of Directors has

appointed an ESOP Committee to act as its agent in performing Suter Company's administration and management duties to the Plan.

37.     Suter Company is and was the Plan's administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

38.     Suter Company is and was an ERISA fiduciary to the Plan as its administrator.

39.     Suter Company is and was the Plan's named fiduciary, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

40.     Suter Company is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

41.     The Plan's participants are current or former employees of Suter Company. At all times leased employees, employees covered by a collective bargaining agreement, nonresident aliens, and independent contractors were excluded from the Plan.

42.     In the initial Plan Year beginning January 1, 2019, there was a "special participation rule" under which persons who were at least age 21 and employed by Suter Company (*i.e.*, classified by Suter Company as employees and thus qualifying as "covered employees") on January 1, 2019 became Plan participants on that date, with the requirement of 1,000 hours of service in a 12 month eligibility period being waived. Any employee hired thereafter in 2019 entered the Plan on the date the employee satisfied the age and covered employee requirements (*i.e.*, the 1,000 hours of service requirement for participation was waived for 2019).

43.     To participate in the Plan, covered employees hired after December 31, 2019, initially were required to attain age 21 and complete a 12 month eligibility period in which they were credited with 1,000 hours of service, with participation commencing on the first day of the

January or July that coincided with or next followed the employee's meeting of these requirements. Effective January 1, 2021, the age requirement was reduced to 18 and eligible employees began participation on January 1 of the year in which the eligibility requirements were met, including one year of service and 1,000 hours of service.

44.     Plan participants who are employed on the last day of the Plan Year and have completed 1,000 hours of service are eligible for an allocation of Company contributions for the year. Participants with 1,000 hours of service who terminated employment prior to the last day of the Plan Year due to death, disability, or retirement are also eligible to receive an allocation of Company contributions. The 1,000 hours of service requirement was not applicable in the initial Plan Year, 2019.

45.     Suter Company employees eligible to participate in the Plan do not have a choice whether to participate in the Plan as part of their compensation package or to choose other compensation for their labor. Participation in the Plan is automatic and employees are not permitted to opt out. Suter Company management informed employees at one or more meetings in 2019 announcing the adoption of the ESOP that they did not have to do anything to participate in the ESOP and their participation would be automatic.

46.     Defendant Timothy P. Suter conducted a selection process for ownership transition of Suter Company from the Suter Family and decided to develop an ESOP at Suter Company.

47.     Tenor Capital Partners (currently known as Tenor ESOP Partners) represented and provided advisory services to the Suter Family and Suter Company from ideation to closing of the ESOP Transaction. Tenor "quarterbacked" the Transaction, guiding its clients in transaction design and coordinating the efforts of all professionals involved. Employees are not

permitted to opt out of participation in ESOPs under Tenor's guidance, and Suter Company employees were not given the option to do so.

48.     Plaintiff was automatically enrolled in the Plan under the Plan's terms, without her election or assent. Because she worked sufficient hours of service, Plaintiff was allocated Suter Company stock to her Plan account during her employment in 2020, 2021, and 2022, in which she was vested under the Plan's terms.

49.     Selling Shareholders hired Tenor Capital Partners as the "quarterback" of the ESOP Transaction, worked with Tenor Capital Partners, and were centrally involved in conceiving of, facilitating, and executing the Transaction. Suter Company President and CEO Timothy P. Suter was involved in directing the preparation of financial statements and projections by his team of subordinate Suter Company management for use in valuations in the Transaction, and approving Suter Company's lending of $62,371,709 (later adjusted to $63,840,499) in the fully leveraged transaction.

50.     "[T]he ESOP world [is] a very incestuous community" because of the "significant long-term business relationships" resulting from parties working together in many ESOP deals, and ESOP trustees maintain "extensive and lucrative business relationships" with seller-side advisors. *See Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 771, 779 (4th Cir. 2019) (citation omitted).

51.     Contracts between Tenor Capital Partners and selling shareholders in other ESOP transactions around the time of the Plan's adoption provided that Tenor's services would include: "assemble the team responsible to execute the Transaction and administer the ESOP after closing, including, ESOT (employee stock ownership trust) trustee."

52. Tenor Capital Partners has worked with and recommended the Trustee (PFS/Paredes) in other ESOP Transactions. At a deposition in February 2021, Todd Butler, founder and Managing Partner of Tenor Capital Partners, could name only three ESOP trustee businesses that he generally tries to engage for the buyer-side on deals, one of which was the Trustee here, Prudent Fiduciary Services, LLC, which includes Miguel Paredes and other personnel.

53. Suter Company's Board of Directors appointed the Trustee to be the buyer-side trustee on advice of the seller-side ESOP advisor Tenor Capital Partners. Timothy P. Suter and Miguel Paredes signed the ESOT's trust agreement. An unconflicted independent fiduciary did not make the appointment.

54. The Board of Directors appointed the Trustee as trustee of the Plan prior to the ESOP Transaction at a time when Selling Shareholders and the Suter Family owned and controlled the Company and its Board of Directors. As trustee, the Trustee had sole and exclusive authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for Suter Company stock. Selling Shareholders, who were the seller-side in the ESOP Transaction and Company Directors, and other members of the Suter Family who were Directors, therefore appointed the buyer-side counter-party trustee in the Transaction.

55. The Trustee received fees from Suter Company for its services as transaction trustee in the ESOP Transaction to the buyer-side Plan under a contract made under Selling Shareholders' ownership and control of Suter Company. The Trustee also received fees after the ESOP Transaction because it was appointed ongoing trustee to the Plan.

56.     The Plan's trustee, PFS/Paredes, derives business from its relationship with the Selling Shareholders' ESOP advisor, Tenor Capital Partners. The observation that the ESOP world is a "very incestuous community" is shown true here. The Trustee was rewarded with engagement as the Plan's ongoing trustee by the Selling Shareholders, who controlled Suter Company, having completed the ESOP Transaction to their satisfaction.

57.     As trustee for the Plan, it was the Trustee's duty to ensure that any transactions between the Plan and Selling Shareholders and between the Plan and Suter Company, including acquisitions of Suter Company stock by the Plan and loans to the Plan, were fair and reasonable and to ensure that the Plan paid no more than fair market value. Under the Plan, in "the initial acquisition of Company Stock … the Trustee will determine fair market value in its own discretion." Under the Plan, in "the initial acquisition of Company Stock … the Trustee may incur a Loan in its discretion."

58.     On September 2, 2020, the Plan, through the ESOT, purchased from Selling Shareholders and the Suter Family, directly or indirectly, 100,000 shares of Suter Company common stock for $62,371,709 that was adjusted upwards on November 1, 2020 to a final price of $63,840,499, reportedly as a result of a working capital adjustment. At that time, Suter Company reportedly became a 100% employee-owned company.

59.     The Plan's purchase of the Suter Company shares was financed by a $62,371,709 term loan agreement with Suter Company that was adjusted to $63,840,499 on November 1, 2020. The note payable was due December 31, 2053, with interest fixed at 1.00 percent.

60.     The parties resorted to financing by seller-controlled Suter Company because they were unable to arrange bank financing for the ESOP Transaction. Prospective bank lenders would have been troubled by the fact that the proposed ESOP Transaction would be 100%

leveraged. A prudent bank would not have financed the transaction at the $62,371,709 and $63,840,499 values without conducting robust due diligence on the loan to ensure that the collateral pledged, the stock, was actually worth $62,371,709 or $63,840,499. Because the parties could not obtain, or knew they could not obtain, bank financing for the transaction, they "financed" the transaction through the Company with a note payable. In violation of ERISA and the terms of the Plan, the loan was not primarily for the benefit of participants and beneficiaries of the Plan, but rather was arranged in the interest of the Selling Shareholders to provide the liquidity enabling them to divest themselves of the Company with the Plan's purchase of their shares in the prohibited and above-fair-market-value ESOP Transaction.

61.     The Plan's Forms 5500 report that the Plan's investment in Suter Company common stock and indebtedness guaranteed by the Company were party in interest transactions.

62.     The Plan permits "Synthetic Equity," which means: "(A) any stock option, warrant, restricted stock, deferred issuance stock right or similar interest or right that gives the holder the right to acquire or receive stock of the Company in the future; (B) a stock appreciation right, phantom stock unit or similar right to future cash payment based on the value of such stock or appreciation in such value; and (C) any nonqualified deferred compensation within the meaning of Treasury Regulation Section 1.409(p)-1(f)."

63.     Defendant Timothy P. Suter was Suter Company's President, CEO, and Director prior to the ESOP Transaction, at the time of the 2020 ESOP Transaction, and after the ESOP Transaction to the present. Timothy P. Suter was very involved in the management of Suter Company. The Selling Shareholders at all relevant times controlled Suter Company as Company Directors and as members of the Suter Family, other members of which were also Directors; through Timothy P. Suter; through employees, appointees, or proxies holding positions as

Directors; due to the millions of dollars of debt they held from the ESOP Transaction including but not limited to rights arising from warrants or other synthetic equity issued to Selling Shareholders, which are trumpeted by the Trustee and Tenor Capital Partners for use in ESOP transactions; through various transaction documents, including the stock purchase agreement and warrants; and through a compliant trustee that could be fired by Suter Company or its Board of Directors.

64.     Since the ESOP Transaction, members of the Suter Family have been the majority of the Board of Directors of Suter Company, to wit, George B. Suter and his children Timothy P. Suter, Daniel B. Suter, and Mary Shawn Ginsberg, have been directors since the ESOP Transaction, and George B. Suter's wife Mary Jane Suter was a director to on or about 2022. Suter Company employee Heidi Wright replaced Mary Jane Suter as director. Heidi Wright is Vice President, Sales and Marketing at the Company; was hired by Timothy P. Suter in 2002; and is subordinate to him in his position as President and CEO. Michael J. Leone and Jeffrey Tushar also served as Directors in the period after the ESOP Transaction.

65.     Tenor Capital Partners advertises that an "ESOP Misconception" is that "Selling shareholders will lose control to employees." Tenor Managing Partner André Schnabl has explained: "The reality is that the selling shareholder, although they have sold a part of their company or potentially 100 percent of their company, they still control the board of directors." Mr. Schnabl has elaborated: "The selling shareholders continue to control the business. They are not removing control and providing the trust with the ability to run their business or control their business. Nothing has happened from a control perspective until the selling shareholders are long gone. They will appoint the entire board; they can fire the trustee; they decide on that all day-to-day operating decisions nothing has changed. So it's extremely important that selling

shareholders don't consider this a typical sale where the buyer is now in control. In this case, the seller remains in control until they put 100 percent of their money out of, out of the deal and in fact under certain circumstances they can continue to control thereafter, uh, because of their warrant positions."

66.     Mr. Schnabl further encourages the use of warrants in ESOP transactions because they can allow selling shareholders to receive "an amount over and above fair value" for their companies, which "can be as much as 20 or 30 percent of the entire business," which over the course of a decade can be "worth more than the entire business was worth the day you sold it." The value of the warrant is manipulable because, as Mr. Schnabl has noted: "a warrant is the right to buy shares in the business at a price that is agreed-upon." He further explained the warrant position "is something that is unique to these, these ESOPs." Warrants thus may give selling shareholders who take debt for the sale of their companies in ESOP transactions compensation above and beyond the amount of the interest rate on the loan paid by an ESOP. "It is the second bite of the apple," Mr. Schnabl explains.

67.     The Plan and its participants did not take control of Suter Company from Selling Shareholders in the transaction conceived and effectuated by Tenor Capital Partners, Selling Shareholders, the Suter Family, and the Trustee.

68.     The Trustee valued the Suter Company stock on a control basis by using an industry capital structure instead of the Company's actual capital structure in its income method, which yielded a control value. But the Plan did not obtain control of the Company, as explained above, because Selling Shareholders maintained control over the board of directors and, through the board, the Company. The Plan should have received a discount for lack of control, but it did not. This means the Plan paid more than fair market value for the stock.

69.     The Trustee's appraisal of Suter Company stock in the ESOP Transaction used income valuation techniques. Suter Company management provided financial statements and projected cash flow and net income to the Trustee for the valuation in the ESOP Transaction. The financial projections were unreasonably optimistic. The Plan overpaid for Suter Company stock in the ESOP Transaction due to the Trustee's reliance on unrealistic growth projections. The Trustee did not adequately challenge information provided by Suter Company management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of Suter Company stock as of the date of the ESOP Transaction.

70.     The appraisal used by the Trustee in the ESOP Transaction used market valuation techniques. The appraisal derived value based on supposedly comparable companies to Suter Company. But the selected comparable companies were too dissimilar to Suter Company to provide a reliable indication of value. Moreover, the discounts applied to the selected multiples derived from the purportedly comparable companies were arbitrary and insufficient to reflect the fair market value of Suter Company, yielding a market based value that substantially overstated the fair market value of Suter Company. Among other things, selected comparable companies differed from Suter Company in financial size, as more diversified food manufacturers, as offering different product lines, and not suffering the same customer concentration risk. Thus, the use of market comparables that were not a good match to Suter Company caused the stock to be overvalued and the ESOT to overpay.

71.     The Trustee failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the ESOP Transaction because it failed to sufficiently account for the lack of marketability for the stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a

right to have the Company or Plan buy any shares of Suter Company stock distributed to participants for which there is no market, and the SPD explains: "If Company stock is distributed, you must immediately sell it to the Company or the Plan." But the Plan was the purchaser in the ESOP Transaction and participants' sales to the Company or Plan did not reduce the lack of marketability to the ESOT of the stock the ESOT owned. In addition, the Plan's lack of control over Suter Company made it lack marketability. The Plan overpaid for Suter Company stock in the ESOP Transaction due to the Trustee's improper application of DLOM.

72.     While the Plan had paid $63,840,499 for the 100,000 shares of Suter Company common stock, as readjusted on November 1, 2020 after the September 2, 2020 transaction, the stock was revalued at $6,400,000 as of December 31, 2020. As of December 31, 2021, the Plan's Suter Company stock was revalued at $27,910,000, after contributions by Suter Company to the Plan. The Plan paid an inflated price due to the Trustee's improper investigation into the value of Suter Company stock as of the date of the ESOP Transaction and its failure to negotiate payment of no more than fair market value.

73.     In breach of their duty of loyalty to plans and their participants and beneficiaries, ESOP trustees have defined and employed deficient "industry" standards for themselves alone that deviate from sound business practices employed by non-ESOP buyers in the so-called "real world" and required by ERISA. In accordance with its and "industry" routine practices, the Trustee's due diligence in the ESOP Transaction was less extensive and thorough than the due diligence performed by third-party buyers in corporate transactions of similar size and complexity. Incentives to the Trustee to fail to exercise care, skill, prudence and diligence in the interest of Plan participants and beneficiaries in the ESOP Transaction by failing to apply sound business principles of evaluation and to conduct a prudent investigation and negotiation included

18

the possibility of business from sellers of companies who understood that the Trustee applied a lesser degree of due diligence in ESOP purchases of businesses than is typical for non-ESOP-buyers' purchases of businesses, referrals for such work by other service providers in the ESOP creation and administration business such as Tenor Capital Partners, and engagement as the Plan's ongoing trustee after the ESOP Transaction and the fees paid for that engagement.

74.     By its terms, the purposes of the Plan are to enable eligible employees to: (i) share in the growth and prosperity of the Company; (ii) accumulate capital for their future economic security; and (iii) acquire beneficial stock ownership interests in the Company. However, the Suter Family, with the help of the Trustee and Tenor Capital Partners, structured the ESOP Transaction to its own benefit and has maintained firm control over the ESOP and the ESOP-owned Company since the time of the Transaction, to the detriment of the Plan and its participants and beneficiaries.

75.     The Plan suffered losses due to the overvaluation of Suter Company stock in the ESOP Transaction and its overpayment for the stock, in an amount to be determined following discovery and expert analysis of non-public information concerning the Trustee's and its financial advisor's valuation and due diligence methodologies, Suter Company financials and growth projections, and other documents and information that were considered or should have been considered in the ESOP Transaction.

76.     Due to the Plan's overpayment, the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered losses to their individual Plan accounts.

77.     The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of Suter Company shares at the time of the ESOP Transaction.

*See*, *e.g.*, *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 282 (7th Cir. 2011) ("when he seeks relief under section 502(a)(2), a plan participant acts as a representative of the plan, and any relief he obtains 'inures to the benefit of the plan as a whole'"); *Neil v. Zell*, 767 F. Supp. 2d 933, 944-45 (N.D. Ill. 2011) (finding "ample support in the case law" that "[w]here the 'breach involved nothing more than paying too high a price for the stock,' liability should be measured at 'the difference between the price paid and the price that should have been paid'").

78.     Selling Shareholders, as co-fiduciaries, are liable to the Plan for the difference between the price paid by the Plan and the fair market value of Suter Company shares at the time of the ESOP Transaction.

79.     Selling Shareholders are liable to the Plan to repay the difference between the price they each received and the fair market value of their Suter Company shares at the time of the ESOP Transaction. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 253 (2000) ("an action for restitution against a transferee of tainted plan assets satisfies the 'appropriateness' criterion in [ERISA] § 502(a)(3) [and] is also 'equitable' in nature") (cleaned up).

## CLAIMS FOR RELIEF

### COUNT I

**Causing Prohibited Transactions Forbidden by**
**ERISA § 406(a), 29 U.S.C. § 1106(a), Against Defendants Paredes and PFS**

80.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

81.     ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee, Defendants Paredes and PFS, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here Suter Company stock, with a party in interest, here Selling Shareholders, as took place in the ESOP Transaction.

20

82.     ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party in interest, here Suter Company, as took place in the ESOP Transaction.

83.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to a party in interest, here Selling Shareholders, of any assets of the Plan, as took place in the ESOP Transaction with the transfer of Plan assets to Selling Shareholders as payment for Suter Company stock.

84.     The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee in its capacity as trustee for the Plan.

85.     The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

86.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

87.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

88.     The Trustee has caused losses to the Plan by the prohibited transactions in an amount to be proved specifically at trial.

## COUNT II

### Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a), Against Defendants Paredes and PFS

89.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

90.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

91.     The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

92.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

93. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

94. The Trustee was required to undertake an appropriate and independent investigation of the fair market value of Suter Company stock in or about September 2020 in order to fulfill its fiduciary duties, and an appropriate investigation would have revealed that the valuation used for the ESOP Transaction did not reflect the fair market value of the Suter Company stock purchased by the Plan.

95. The Trustee was required to act independently on behalf of the Plan, to probe and question projections and other information provided by Suter Company management, and it did not adequately do so.

96. The Trustee was required to negotiate for the Plan to pay no more than fair market value for Suter Company stock in the ESOP Transaction, and it failed to do so, but instead approved the imprudent Transaction.

97. The Trustee breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

98. The Trustee has caused losses to the Plan by its breaches of fiduciary duty in an amount to be proved specifically at trial.

## COUNT III

### Knowing Participation in ERISA Violations Pursuant to 29 U.S.C. § 1132(a)(3), Against Timothy P. Suter, George B. Suter, and Daniel B. Suter

99. Plaintiff incorporates the preceding paragraphs as though set forth herein.

100. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), *inter alia*, permits a plan participant to bring a civil action to obtain appropriate equitable relief to redress violations of the provisions of Title I of ERISA, or to enforce the provisions of Title I of ERISA or the terms of a plan.

101.     The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

102.     As a result of the prohibited stock transaction and breaches of fiduciary duty described above, Selling Shareholders received Plan assets in payment above fair market value for their Suter Company stock.

103.     Selling Shareholders were parties in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as described above.

104.     Selling Shareholders knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of their Suter Company stock in the ESOP Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that they had the statuses that made them parties in interest, (5) that the Trustee caused the Plan to engage in the stock transaction, and (6) that they received monetary assets of the Plan in the ESOP Transaction.

105.     As parties to the stock purchase agreement containing the terms of the Plan's stock purchase from Selling Shareholders and countersigned by the Trustee on behalf of the ESOT; as sellers of stock with an interest in having knowledge of and competently negotiating the Transaction; as directors of Suter Company, which participated in the $62 million dollar loan component of the Transaction with their approval, which was the sponsor and fiduciary administrator of the Plan, and which was their family business; as Plan fiduciaries; as appointers of the Trustee to be the Plan's trustee, who therefore bore a fiduciary duty to monitor the trustee; and as to Timothy P. Suter as Company President and CEO whose team provided company

24

information to the buyer side, Selling Shareholders were aware of sufficient facts that the ESOP Transaction constituted a prohibited transaction. Further, Selling Shareholders were aware of sufficient facts that the Plan paid more than fair market value in the Transaction and that the Trustee did not adequately investigate and value the stock.

106.     Selling Shareholders are liable for knowingly participating in violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D), alleged in Count I.

107.     Selling Shareholders are liable for knowingly participating in violations of ERISA § 404(a), 29 U.S.C. § 1104(a), alleged in Count II.

108.     Selling Shareholders profited from the prohibited stock transaction in an amount to be proven at trial, and upon information and belief, they remain in possession of assets that belong to the Plan.

109.     Selling Shareholders are subject to appropriate equitable relief including disgorgement or restitution of any ill-gotten gains they received in connection with the ESOP Transaction, accounting for profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for Suter Company stock as of the date of the Transaction and to give the Plan powers or other consideration for which it paid but did not receive, having the transaction rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## COUNT IV

**Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a), Against Timothy P. Suter, George B. Suter, and Daniel B. Suter**

110.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

111.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission was a breach."

112.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), further provides liability on a fiduciary "if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach."

113.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), further provides liability on a fiduciary "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

114.     Selling Shareholders were members of the Suter Company Board of Directors with authority to appoint and remove the fiduciary ESOP Committee and the fiduciary trustee and to control the Named Fiduciary and Plan Administrator Suter Company, and thus they were fiduciaries with respect to the Plan at the time of the ESOP Transaction.

115.     Given their participation in the ESOP Transaction, as stated above, their positions as Directors, their access to company financial information, their appointment of the Trustee, and Timothy P. Suter's positions as CEO and President, Selling Shareholders knew or should have known of the fiduciary breaches of the Trustee in connection with its faulty due diligence and imprudent approval of the stock purchase for more than fair market value, and Selling Shareholders knowingly participated in the Trustee's fiduciary breaches as participants in the stock transaction and as persons controlling Suter Company, which participated in the loan

transaction, and enabled the Trustee's fiduciary breach by themselves failing to monitor as required of an appointing fiduciary.

116.     As such, under ERISA § 405(a)(1)-(2), 29 U.S.C. § 1105(a)(1)-(2), Selling Shareholders are liable as co-fiduciaries for the Plan's losses resulting from the Trustee's fiduciary breaches.

117.     Selling Shareholders failed to make reasonable efforts to remedy the Trustee's violations of ERISA associated with the ESOP Transaction despite knowing of such violations, such as preventing the Plan's overpayment, reimbursing the Plan, or bringing the matter to the attention of the Secretary of Labor.

118.     Pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), Selling Shareholders are liable as co-fiduciaries for the Plan's losses resulting from the Trustee's fiduciary breaches.

## CLASS ACTION ALLEGATIONS

119.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in The Suter Company, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants as of the date of the September 2, 2020 ESOP Transaction or anytime thereafter. Excluded from the Class are the shareholders who sold their The Suter Company, Inc. ("Suter Company") stock to the Plan, directly or indirectly, and their immediate families; the directors and officers of Suter Company and their immediate families; and legal representatives, successors, and assigns of any such excluded persons.

120.     The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiff at this time, the Plan's most recent Form 5500 filing reports that as of December 31, 2021, there were 273 participants in the Plan.

121.     Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

i.      Whether Defendants Paredes and PFS served as trustee in the Plan's acquisition of Suter Company stock;

ii.     Whether the Trustee was an ERISA fiduciary of the Plan;

iii.    Whether the Trustee caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase Suter Company stock and take a loan from parties in interest;

iv.    Whether the Trustee engaged in good faith valuations of Suter Company stock in connection with the ESOP Transaction;

v.     Whether the Trustee caused the Plan to pay more than fair market value for Suter Company stock;

vi.    Whether the Trustee breached its fiduciary duty to undertake an appropriate and independent investigation of the fair market value of Suter Company stock on or about September 2, 2020;

vii.   Whether Suter Company was a party in interest and gave a loan to the Plan;

viii.  Whether Selling Shareholders were parties in interest;

ix.    Whether Selling Shareholders knowingly participated in the prohibited stock transaction and breaches of fiduciary duty;

x.     Whether Selling Shareholders were fiduciaries;

xi.    Whether Selling Shareholders are liable as co-fiduciaries for the fiduciary breaches by the Trustee;

xii.   The amount of losses suffered by the Plan and its participants as a result of the Trustee's ERISA violations; and

xiii.    The appropriate relief for Defendants' violations of ERISA.

122.    Plaintiff's claims are typical of those of the Class. For example, Plaintiff, like other Plan participants in the Class, suffered a diminution in the value of her Plan account because the Plan paid above fair market value and took on an excessive loan for Suter Company stock, resulting in her being allocated fewer shares of stock, and she continues to suffer such losses in the present because the Trustee failed to correct the overpayment by the Plan.

123.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

124.    Class certification of Plaintiff's Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

125.    The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.    Declare that Defendant Trustee caused the Plan to engage in prohibited transactions and thereby breached its duties under ERISA;

B.    Declare that Defendant Trustee breached its fiduciary duties under ERISA to the Plan and the class members;

29

C.     Declare that Selling Shareholders knowingly participated in a prohibited transaction with the Plan in violation of ERISA;

D.     Declare that Selling Shareholders are liable as co-fiduciaries for Defendant Trustee's breaches of fiduciary duty;

E.     Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

F.     Order reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for Suter Company stock as of the date of the transaction, to provide the Plan receives that for which it paid including control of Suter Company where it did not receive a discount for lack of control and did not obtain control of the Company's board of directors under contractual governance provisions, and any other appropriate reformation;

G.     Order rescission of the ESOP Transaction;

H.     Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

I.     Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

J.      Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

K.      Remove Defendants as Plan fiduciaries, enjoin them from acting as fiduciaries for any employee benefit plan that covers or includes any Suter Company employees or members of the Class, and appoint independent fiduciaries in place of Defendants;

L.      Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

M.      Enjoin Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

N.      Enjoin Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan participants' ability to recover the same;

O.      Order Defendants to pay prejudgment and post-judgment interest;

P.      Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative and her counsel as class counsel; and

Q.      Award such other and further relief as the Court deems equitable and just.

Dated:    June 16, 2023                Respectfully submitted,

                                       **BAILEY & GLASSER LLP**

                                       */s/ Patrick O. Muench*
                                       Patrick O. Muench
                                       318 W. Adams Street, Ste. 1512
                                       Chicago, IL 60606
                                       Telephone: (312) 500-8680
                                       Facsimile: (304) 342-1110
                                       pmuench@baileyglasser.com

                                       Gregory Y. Porter (*pro hac vice to be filed*)
                                       Ryan T. Jenny
                                       1055 Thomas Jefferson Street, NW, Ste. 540
                                       Washington, DC 20007
                                       Telephone: (202) 463-2101
                                       Facsimile: (202) 463-2103
                                       gporter@baileyglasser.com
                                       rjenny@baileyglasser.com

                                       *Attorneys for Plaintiff Nichole Harris*