## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| Nichole Harris, on behalf of The Suter Company, Inc. Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated, | | |
| Plaintiff, | | Case No. 3:23-cv-50231 |
| v. | | Honorable Iain D. Johnston |
| Migues Paredes, Prudent Fiduciary Services, LLC, a California Limited Liability Company, Timothy P. Suter, George B. Suter, and Daniel B. Suter, | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Nichole Harris brings this ERISA action on behalf of The Suter Company Employee Stock Ownership Plan and similarly situated participants in the Plan against Miguel Paredes and his company Prudent Fiduciary Services—the Plan's trustee—as well as Timothy P. Suter, George B. Suter, and Daniel B. Suter, directors of the Suter Company and its former owners. She alleges that the trustee breached his fiduciary duties to the Plan and caused it to suffer loss through a dodgy purchase of Suter Company stock from, among others, the Suter defendants; she seeks to recover that loss. The defendants have each filed a motion to compel arbitration of her claims. For the following reasons, the motions are granted.

1

## I. Background

Nichole Harris was employed by the Suter Company, a food manufacturer based in Sycamore, Illinois from 2016 to early 2023. Dkt. 1 ¶¶ 13, 26. The Suter Company adopted the defined-contribution Plan at issue here as of January 1, 2019, and remains its sponsor and administrator. *Id.* ¶¶ 29, 33-34, 36-37. For 2019, certain employees received Suter Company stock under the Plan by a special participation rule; each year thereafter, employees over 21 years old who had worked a certain number of hours in that year received an additional allocation of stock. *Id.* ¶¶ 42-44. Harris received these allocations while she was employed there. *Id.* ¶ 48. Participation in the Plan was obligatory, serving as part of employees' compensation. *Id.* ¶ 45.

In June of 2020, Miguel Paredes and his company Prudent Fiduciary Services were appointed by the Suter Company's Board of Directors—whose members included the Suters named in this suit—as the Plan's trustee with plenary authority to manage the Plan's assets, which were held in an employee stock ownership trust. *Id.* ¶¶ 15, 25, 54. On September 2, 2020, the trustee caused the Plan to buy 100,000 shares of the Suter Company's stock from members of the Suter family at an ultimate price of over $ 63 million. *Id.* ¶ 58. This purchase was entirely leveraged, financed by a loan from the Suter Company. *Id.* ¶ 59. Subsequent valuations of the stock allegedly showed it to be worth far less than the purchase price: worth only $ 6 million at the end of 2020, and around $ 28 million at the end of 2021. *Id.* ¶ 72.

Unsurprisingly, Harris says that the trustee violated his fiduciary duties to the Plan through the purchase of the Suters' stock. She alleges several violations of ERISA: that the sale and loan were forbidden transactions with parties in interest, as ERISA defines that term; that that the trustee was conflicted, having been appointed by the Suter Company's Board, yet negotiated the transaction anyway, in violation of his duty of loyalty; and that the purchase price for the stock was well over its fair market value, because the trustee failed to exercise due diligence in violation of his duty of care. *Id.* ¶¶ 80-98. She also seeks to hold the three Suter defendants, in various capacities, liable for their role in the sale, either because they were knowingly party to the trustee's violations or are co-fiduciaries of the Plan, and thus are also responsible under ERISA for making good to the Plan the losses that came from the trustee's breach of his fiduciary duties. *Id.* ¶¶ 99-118.

The defendants seek to compel arbitration of Harris' claims under an arbitration agreement. The Plan has always included an arbitration clause, but it was recently altered—in the form of Amendment Five—on August 17, 2023—two months after Harris filed this suit on July 16, 2023. *See* Dkt. 1; Dkt. 35 at 13.

## II. Legal Standard

Whether arbitration can be compelled under the Federal Arbitration Act (FAA) involves two questions: (1) whether there is an agreement to arbitrate; and (2) whether the claims brought fall within the scope of that agreement. *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019). The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). To

3

give effect to the FAA's "liberal federal policy" in favor of arbitration, any doubt concerning the scope of the agreement should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

## III. Analysis

### A. Amendment Five is an arbitration agreement within the meaning of the FAA

Fundamentally, arbitration requires consent. *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 651 (2022). The FAA makes this principle effective by requiring an "agreement in writing" for arbitration to be compelled. 9 U.S.C. § 3.[1] Whether such an agreement exists is generally determined by some state's law of contracts, but not necessarily. *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.,* 765 F.3d 776, 781 (7th Cir. 2014). An agreement under section 3 of the FAA is in fact "no more than an offer and acceptance that produces a legally binding document." *Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns Int'l, Inc.*, 294 F.3d 924, 926 (7th Cir. 2002). Thus, it may be that a section 3 agreement embodies the necessary consent to arbitration in a looser form than the consent that would have been required to support a state-law contract containing an arbitration clause. *See id.* (holding that a unilaterally-imposed regulatory tariff was a valid "agreement").

---

[1] Strictly speaking, the FAA makes "valid, irrevocable, and enforceable" two different types of arbitration agreements: (1) "written provision[s] in . . . contract[s]" governing controversies "thereafter arising out of such contract[s]" and (2) "agreement[s] in writing" to arbitrate "existing controvers[ies]." 9 U.S.C. § 2. This distinction seems to suggest that after a dispute has arisen, the parties are expected to reach a separate agreement rather than modify the underlying contract. The parties make nothing of this; neither shall the Court.

That looser form of consent under an agreement is present here in the form of Amendment Five. An ERISA plan is established and maintained by a "written instrument" which specifies the legal rights and obligations that exist under the plan. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (cleaned up) (quoting 29 U.S.C. § 1102(a)(1)); *see also Mathews v. Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998) (finding that ERISA plans are a species of binding contract despite being in some sense imposed on those they bind). ERISA itself contemplates amendment of the plan's written instrument, 29 U.S.C. § 1102(b)(3), which generally may be done "for any reason at any time." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999) (cleaned up). The resulting document is legally binding, *see Curtiss-Wright*, 514 U.S. at 84, even if amended unilaterally, and even if of retroactive effect, so long as the amendment complies with ERISA and the terms of the plan itself. *See Mathews*, 144 F.3d at 461 (unilateral amendment); *Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 744 (7th Cir. 2013) (retroactive amendment). Harris makes no argument that Amendment Five's implementation was procedurally defective under the terms of the Plan or violative of ERISA, nor is there any reason to think so; it therefore constitutes a valid and binding amendment to the Plan, and consequently is an agreement for purposes of section 3 of the FAA.

### B. Amendment Five covers Harris's claims under section 502(a)(2)

Having been found to be effective, Amendment Five must also cover this suit before arbitration can be compelled. It does, for three reasons.

5

First, as a general matter, ERISA claims fall under the FAA and are susceptible of arbitration. *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 620 (7th Cir. 2021).

Here, Harris brings claims under ERISA section 502(a)(2). Dkt. 35 at 2-3.[2] Such claims are brought in a "representative capacity on behalf of the plan," *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, and address only "plan injuries." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). Thus, contrary to Harris' arguments, "the presence or absence of [her] consent to arbitration is irrelevant; what counts is the contract created *by the plan*." *Berkelhammer*, 74 F.4th at 120 (3d Cir. 2023) (emphasis added).

Amendment Five to the Plan requires that:

> Any claim made by or on behalf of a . . . Participant . . .
> which arises out of, relates to, or concerns this Plan . . .
> including . . . any claim asserting a breach of, or failure to
> follow, any provision of ERISA . . . shall be resolved
> exclusively by binding arbitration . . . .

Dkt. 50A at Schedule 1, at 4.

While the ordinary principles of contract *formation* are inapplicable in ERISA matters, the ordinary principles of contract *interpretation* generally apply. *Smith*, 13 F.4th at 618. As they are applied here, Amendment Five gives the Plan's consent

---

[2] The complaint also purports to brings claims under section 502(a)(3), but as Harris acknowledges in her motion papers, there is "no material distinction" between sections 502(a)(2) and 502(a)(3) here, because plans also obtain relief under the latter. Dkt. 35 at 12 n.3. If that is so, then "relief is not appropriate under § 502(a)(3) [because] another provision [of ERISA] offers an adequate remedy." *Berkelhammer v. ADP TotalSource Grp., Inc.*, 74 F.4th 115, 119 n.5 (3d Cir. 2023). To the extent that any claims might need to be brought under section 502(a)(3) to obtain adequate relief, they are equitable in nature and brought in one's "individual capacity" within the meaning of the arbitration agreement (as will be shown below), so they are equally subject to compulsory arbitration, and any distinction is moot.

(speaking loosely) to arbitrate Harris' claims, which (1) certainly "arise out of, relate to, or concern" the Plan; (2) are made by a Participant, as defined in Article II of the Plan, Dkt. 50A at 10-14; and (3) assert a breach of a provision of ERISA, as section 502(a)(2) claims necessarily do.

Secondly, Amendment Five applies to Harris's claims, even though it was not implemented until after Harris brought them in this suit. The FAA explicitly contemplates the enforceability of agreements to arbitrate "existing controvers[ies]." 9 U.S.C. § 2. Here, Harris' principal—the Plan, on whose behalf she brings these claims, *see Viking River*, 596 U.S. at 657—validly agreed to arbitrate an existing dispute.

Finally, Amendment Five applies because it does not violate the effective vindication exception to the FAA, which forbids compulsory arbitration when the statute authorizing a claim allows a given remedy, but the arbitration agreement disallows it. *Smith*, 13 F.4th at 621.

Three provisions of Amendment Five are relevant here:

- *14.8(b)*—which requires that all claims subject to the arbitration agreement be brought solely in a claimant's "individual capacity" and not "on a class, collective, or group basis";

- *14.8(b)(i)*—which makes 14.8(b) a "material and non-severable term" of the arbitration agreement; and

- *14.8(b)(ii)*—which limits "equitable, injunctive, and non-monetary relief" available under ERISA solely to the individual claimant, but only to the extent consistent with ERISA.

Dkt. 50A at Schedule 1, at 5.

First, we must determine what remedies are allowed by section 502(a)(2) before determining whether they are thwarted by the agreement.

Section 502(a)(2) provides a cause of action to certain persons[3] for "appropriate relief" under section 409 when a plan's fiduciary breaches his obligations. 29 U.S.C. §§ 1109, 1132. That relief can include: (1) holding the fiduciary personally liable for the breach to the extent required to "make good to [the] plan any losses to the plan" from the breach and for the restoration of any profits made through the fiduciary's impermissible use of the assets, and (2) "such other equitable or remedial relief" as appropriate. 29 U.S.C. § 1109(a). On its face, this language seems to "permit recovery of *all* plan losses caused by a fiduciary breach." *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

Unlike in *Smith*, the limitation here on equitable and non-monetary relief represented by 14.8(b)(ii) is essentially illusory, as far as the effective vindication doctrine is concerned; to the extent it conflicts with ERISA, it gives way. Harris' quarrel is instead with the agreement's purported limitations on monetary relief. [4]

---

[3] This class includes "participants" in ERISA plans, including "former employee[s] of an employer . . .who [are] . . .eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . ." 29 U.S.C. § 1002. Harris satisfies this definition.

[4] The Court assumes without deciding that there is some category of relief available under section 502(a)(2) that can be regarded as non-equitable. That proposition seems at least somewhat doubtful, both because of ERISA's close relationship to the law of trusts, *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996), as well as section 409's language, which likewise suggests that the remedies are equitable. In the first place, the specifically enumerated remedies sound very much like an equitable accounting. *See, e.g.*, Accounting for Profits, Black's Law Dictionary (11th ed. 2019) ("An action for equitable relief against a person in a fiduciary relationship to recover profits taken in a breach of the relationship). Also, that the final and more general term listed in section 409(a) allows for "*such other* equitable or remedial relief" as appropriate suggests that the preceding terms also list forms of

She says that she is entitled to recover not only the loss to her individual account but is also entitled to "plan-wide monetary relief"—that is, recovery of all losses suffered by the Plan because of the defendants' violations of ERISA. Dkt. 53 at 7. The defendants contend there is no such right under section 502(a)(2) to "pursue losses to other [defined-contribution] plan accounts." Dkt. 54 at 12. Harris has the better of the argument.

In defending their position to the contrary, the defendants rely on the Seventh Circuit's decision in *Smith* and its treatment of *LaRue*. In *Smith*, the court held that because the arbitration agreement at issue forbade removal of a fiduciary—a remedy "expressly contemplated" by section 409—the claimant could not effectively vindicate his rights under ERISA. 13 F.4th at 621. The court went on to say that the problem with the relevant arbitration agreement was *not* its prohibition on "plan-wide representation" (it contained a similar class-action waiver to that present in Amendment Five), because "*individualized arbitration [is not] inherently incompatible with ERISA.*" *Id.* at 622 (emphasis added). In support of that proposition, the court cited *LaRue's* holding that an individual may recover for a breach that impairs the value of plan assets held in an individual's account. *Id.* (citing 552 U.S. at 256).

The defendants argue that by this, the court implied that a claimant under section 502(a)(2) is *only* entitled to recover for the injury to his individual account

equitable relief. 29 U.S.C. § 1109 (emphasis added). If the relief available under section 502(a)(2) is equitable, then there is certainly no problem of effective vindication, because, as has been noted, the limitation in the agreement on such relief is toothless.

unless he "obtain[s] court approval by means of class certification or some other procedural protection mechanism" to try to obtain broader relief. Dkt. 54 at 11.[5]

That conclusion, however, only follows by reading *LaRue* and *Smith* for more than they are worth. In the first place, *LaRue*'s discussion of the irrelevance of *Russell*'s "entire plan" language[6] was not to limit the scope of the remedy, but to rightly interpret section 502(a)(2) so as the broaden the scope of the cause of action. The court found that "[w]hether a fiduciary breach diminishes plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts, it creates the kind of harms that concerned the draftsmen of § 409," thus giving rise to a cause of action under section 502(a)(2); it was for that reason that the "entire plan" language was irrelevant with respect to a defined-contribution plan. *LaRue*, 552 U.S. at 256. *LaRue* thus merely held that section 502(a)(2) claims are available to remedy plan injuries, a category which includes the impairment of the value of any "plan assets in a participant's individual account." *Id.* It thus describes a sufficient condition to validly bring suit while saying nothing about the scope of the remedy available to the plan. *See Smith v. Med. Benefit Administrators Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011) ("*LaRue* simply holds that in the context of a defined contribution pension plan, in which there are individual accounts holding assets for each participant, malfeasance by a plan fiduciary that

---

[5] Further support for this interpretation of *Smith* might be found in its footnote six, in which the court disclaims the relevance of what it calls "dicta" from *Russell*—a "defined benefit plan case"—expressing the view that because section 502(a)(2) also confers a cause of action on the Secretary of Labor, it shows Congress intended that such actions are to be brought in a "representative capacity on behalf of the plan as a whole." 13 F.4th at 622 n.6.

[6] "[O]ur references to the 'entire plan' in *Russell,* which accurately reflect the operation of § 409 in the defined benefit context, are beside the point in the defined contribution context." *LaRue*, 552 U.S. at 256.

adversely affects the value of the assets held in such an account will support a suit under sections 409 and 502(a)(2) regardless of whether the wrongdoing affects one account or all accounts in the plan.").

Secondly, *Smith* can be read as saying nothing to the contrary. Its assertion that individualized arbitration is not inherently incompatible with ERISA and its distinction between plan-wide representation and plan-wide remedies can be read, contrary to the defendants' interpretation, as merely restating the holding of *LaRue*: that a claimant need not have suffered a plan injury that sweeps any more broadly than his own account. *See Smith*, 13 F.4th at 621.[7]

Thus, the Court disagrees with defendants' interpretation of *Smith*. As other circuit courts show, a better interpretation exists. With the benefit of *Smith*, the Third and Tenth Circuits have since found that section 502(a)(2) permits a claimant to seek "monetary relief to non-party plan participants." *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 507 (3d Cir. 2023) (plan-wide relief in the form of restitution is "expressly authorized" by section 409); *see Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors*, 59 F.4th 1090, 1106–07 (10th Cir. 2023) (finding that section 502(a)(2) could not be effectively vindicated when an arbitration agreement forbade the imposition of liability on the allegedly breaching fiduciaries for "losses suffered by the Plan generally," the restoration of "all the losses resulting from the fiduciary breaches," and the disgorgement of "all profits made through use of assets"). The Court agrees that the best reading of the statute is that it authorizes plan-wide monetary relief.

---

[7] Although it seems likely he *must* have suffered some diminution to his plan account to satisfy Article III standing. *See Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1620 (2020).

Next, we must determine whether 14.8(b)—which permits a claimant to bring claims only in his "individual capacity" and not "on a class, collective, or group basis"—thwarts the realization of that remedy. In short, even if section 502(a)(2) claims are not brought in one's individual capacity in a certain sense, as a matter of contract interpretation the term as used here embraces them and therefore does not implicate the effective vindication exception.

Strictly speaking, section 502(a)(2) claims are "derivative" and "representative" claims that belong to ERISA plans even when asserted on the plan's behalf by an individual claimant. *Hawkins v. Cintas Corp.*, 32 F.4th 625, 632 (6th Cir. 2022). A straightforward interpretive approach to the arbitration agreement would therefore conclude that section 502(a)(2) claims cannot be arbitrated because they are not brought in one's individual capacity. If that is so, then a claimant's right to effectively vindicate the remedies available under ERISA would be frustrated, and the whole arbitration agreement would fail under 14.8(b)(i), which provision makes the individual capacity requirement a "material and non-severable term" of the agreement. This interpretation would preclude the arbitrability of any section 502(a)(2) claims, or any other representative claims brought under ERISA, and would render the whole arbitration clause nugatory whenever such a claim was brought.

This result is improbable. The defendants maintain that Amendment Five was added to the agreement in light of *Smith*, so as to avoid the application of the effective vindication doctrine by removing the "language that the Seventh Circuit found troublesome." Dkt. 22 at 2. It has long been clear that section 502(a)(2)

12

claims—even in the defined-contribution context—are brought "on behalf of a plan", *LaRue*, 552 U.S. at 253; it would thus be passing strange to enact an amendment to the agreement to avoid *Smith*'s bite, only to leave the "individual capacity" language that would obviously spell its destruction. The general principle that "it is almost never right to read legal language as self-defeating," and that courts should strive to avoid reading specific terms that "devastate [the] surrounding language," *Metro East*, 294 F.3d at 925–26, demands a different interpretation of 14.8(b) if the language can bear it.

The history of the arbitration agreement is instructive on this point and supports a better construction. Before Amendment Five, the arbitration agreement required that all claims be brought solely in a claimant's "individual capacity and *not in a representative capacity* or on a class, collective, or group basis." Dkt. 50A at 74 (emphasis added).

Amendment Five, however, only requires that claims be brought "in an individual capacity and not on a class, collective, or group basis." *Id.* at 88. Because of Amendment Five's avowed purpose—saving the arbitration clause from nullity on account of the effective vindication exception—it seems that the best reading of this language is that section 502(a)(2) claims are not intended to be forbidden under the arbitration agreement.

In the first place, Amendment Five has excised the injunction against bringing claims in a "representative capacity"; this suggests that its drafters appreciated that a large swathe of ERISA claims are brought on behalf of the plan and attempted to avoid triggering the effective vindication exception—and the

13

consequent shipwreck of the whole arbitration agreement—every time such claims are brought.

Secondly, reading individual capacity in its technical sense would render the representative capacity language superfluous. That is, section 502(a)(2) claims would be equally unavailable with or without the bar on "representative capacity" claims, because forbidding claims not brought in one's individual capacity, strictly understood, would of its own force preclude them. A reading that gives it another meaning would not require the conclusion that this portion of Amendment Five was implemented to no effect.

Finally, the phrase "individual capacity" can naturally (if not technically) be read here as standing in opposition only to the bringing of claims on a "class, collective, or group basis." That is, it merely expresses the agreement's requirement that any arbitration be bilateral—even in the looser sense of a single claimant litigating on behalf of the Plan against a single defendant in each arbitration— rather than class-wide. *Cf. Viking River*, 596 U.S. at 657. Such a waiver of a right of class representation, as *Smith* noted, is perfectly licit and does not implicate the effective vindication doctrine. 13 F.4th at 622. Reading the arbitration agreement only to forbid non-bilateral arbitration is consistent with its language and saves it from futility in a considerable subset of its likely applications, consonant with its announced purpose. The effective vindication exception therefore does not apply.

\*　　　　　\*　　　　　\*

With this understanding, the arbitration agreement is effective as to Harris' claims. To the extent that Harris brings section 502(a)(2) claims that are to be

pursued solely by her on behalf of the Plan—that is, in her "individual capacity" within the meaning of the arbitration agreement—arbitrating them is compulsory. To the extent that Harris purports to bring claims on behalf of a class under section 502(a)(2), the Plan has validly agreed to waive that right, and she may not pursue them in arbitration.

## IV. Conclusion

For the foregoing reasons, the defendants' motions to compel arbitration are granted. This action is hereby stayed under 9 U.S.C. § 3 until an arbitration has been had in accordance with the terms of the agreement. *See Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007).

Date: February 26, 2024

_____
Honorable Iain D. Johnston
United States District Judge